**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| TRENT STRADER, on behalf of himself and all others similarly situated, | ) ) ) | **CLASS ACTION COMPLAINT** |
| Plaintiff, | ) ) | **JURY TRIAL DEMANDED** |
| vs. | ) ) | No. 1:16-cv-00381 |
| VIZIO, INC., | ) ) ) | |
| Defendant. | ) | |

**CLASS ACTION COMPLAINT**

Plaintiff, Trent Strader, on behalf of himself and all others similarly situated, alleges:

**NATURE OF THE CASE**

1.     Defendant's "smart" televisions collect personally identifying information, including information that identifies a person as having obtained or requested specific video materials or services, through its Smart Interactivity software, and then discloses this private information to third parties, such as advertisers and data brokers.

2.     The third parties that obtain the personally identifying data are then able to push targeted ads to electronic devices that share the same Internet network connection as a Vizio "smart" television.

3.     Plaintiff and the proposed Class Members did not consent to and did not know about Defendant's Smart Interactivity software and had they known

about it and that they were being actively monitored, they would not have purchased Defendant's "smart" televisions.

## PARTIES

4.      Plaintiff Trent Strader is domiciled in Indiana and is a citizen of Indiana.

5.      Defendant Vizio, Inc. ("Vizio") is a citizen of California. Vizio is a California corporation with its principal place of business located at 39 Tesla, Irvine, California 92618.  Vizio does business throughout the United States and the State of Indiana, including in this District.

## JURISDICTION & VENUE

6.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because certain claims arise under federal law, namely the Video Privacy Protection Act. This Court has supplemental jurisdiction over state law claims.

7.      This Court also has diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action involving more than 100 Class Members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and many Members of the Class are citizens of states different from the Defendant.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Vizio regularly transacts business here, and some of the Class Members reside in this district. The causes of action for the putative Class Members also arose, in part, in this District.

2

## CLASS ACTION ALLEGATIONS

9.      Plaintiff brings all claims as class claims under Federal Rule of Civil

Procedure 23. The requirements of Federal Rule of Civil Procedure 23(a) and

23(b)(3) are met with respect to the Classes defined below:

**Nationwide Class:** All persons who purchased a Vizio Smart TV in the

United States.

**Indiana State Class:** All persons who purchased a Vizio Smart TV in the

State of Indiana.

10.      The Class is so numerous that joinder of all Members is impracticable.

Vizio sold over eight million Smart TVs, including a substantial number in Indiana.

Members of the Classes are thus too numerous to practically join in a single action.

11.      There are numerous questions of law and fact common to Plaintiff and

the Class, including the following:

a.   Whether Defendant installed tracking software on the Vizio Smart

    TVs;

b.   Whether Defendant attempted to conceal from its customers the

    existence of this tracking software on the Vizio Smart TVs;

c.   Whether Defendant actually notified customers that the tracking

    software was installed on the Vizio Smart TVs;

d.   Whether Defendant did indeed, and continued to, monitor and track its

    customers' viewing habits;

3

e.  Whether Defendant Vizio unlawfully disclosed and continues to unlawfully disclose consumers' personally identifiable information, including their viewing records, in violation of 18 U.S.C. § 2710(b);

f.  Whether Vizio's disclosures were committed knowingly;

g.  Whether Vizio's conduct as described herein was willful;

h.  Whether Vizio's conduct described herein constitutes fraudulent omission;

i.  Whether Vizio's conduct described herein constitutes negligent omission; and

j.  Whether Vizio's conduct described herein has caused it to be unjustly enriched.

12.   Plaintiff's claims are typical of the claims of the Class in that the representative Plaintiff, like all Class Members, purchased a Vizio Smart TV, giving rise to substantially the same claims.

13.   Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel who is experienced in class-action and complex litigation. Plaintiff has no interests that are adverse to, or in conflict with, other Members of the Class.

14.   The questions of law and fact common to the Class Members predominate over any questions which may affect only individual Members.

15.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of

law and fact is superior to multiple individual actions or piecemeal litigation. Moreover, absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy.

16.     The prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Vizio. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

**FACTS**

17.     Defendant Vizio bills itself as a leading high definition television producer in the United States. In addition to televisions, Vizio manufactures and sells various audio and entertainment products, including sound bars, tablets, DVD players, and Blu-ray players. Vizio generated approximately $3 billion in revenue in 2014.

18.     Cognitive Media Networks, Inc. is an advertising company that provides "Automatic Content Recognition" software (hereinafter "ACR software" and "tracking software") for Smart TVs. This software enables Defendant to monitor and identify Class Members' video viewing habits. Cognitive provides this secretly collected information to third-party advertisers and content providers who, in turn, display targeted advertisements, based on this collected information, to consumers.

5

19.     Vizio Smart TVs provide consumers with multiple access points to visual, audio, and other video content. As with many Smart TVs, Vizio Smart TVs are equipped with HDMI connections, coaxial connectors, analog audio outputs and inputs, and various video input connectors.

20.     Vizio Smart TVs are also equipped with the ability to connect to the internet via wireless internet networking (hereinafter "WiFi"). Specifically, Vizio Smart TVs allow consumers to access the WiFi networks via the Vizio Internet App and the Vizio Internet App Plus software services.  These applications allow consumers to access and watch various forms of audio and visual entertainment online, as well as to find access to online news, weather, and entertainment sources.

21.     Vizio Smart TVs are delivered to consumers with many pre-installed applications. These include such popular internet applications as Netflix, YouTube, Amazon, Pandora, HuluPlus, Twitter, and more. Many of these applications stream video to consumers via Vizio Smart TVs. In fact, the Vizio Smart TV remote control contains shortcuts providing direct access to some of the more popular video streaming services, such as Netflix, with the push of one, direct-access button.

22.     Additionally, Vizio Smart TVs provide access to cable television, satellite television, and on-demand viewing services. Such services also stream video and audio programming directly to Vizio Smart TVs.

23.     Recent investigations have determined that Vizio uses ACR software to secretly monitor and track, in real time, the viewing habits of its customers. This tracking software, referred to by Vizio as "Smart Interactivity," is activated by

default for the more than 10 million Vizio Smart TVs the company has sold in recent years.

24.     According to the detailed investigations, the Vizio tracking software works by analyzing bits of the video and other visual programming its customers are watching, in real time.   The technology then allows Vizio to determine the date, time, channel of programs, and whether customers watched this programming in real time or from a recording.

25.     The tracking technology also allows Vizio to determine whether a viewer is watching a traditional television or cable program or whether the customer is viewing programming via streaming Internet applications such as Netflix, Amazon Prime, or Hulu. The technology determines the time frame during which the programming was viewed, as well as the duration for which the customer actually viewed it.

26.     Vizio, armed with this surreptitiously-collected information on the customers' viewing habits, then connects the information to the customers' personal internet protocol (hereinafter "IP") address. This is the internet address that is used to identify every internet connected device in a home, office, or other connected environment. These devices include smartphones, tablet computers, laptop computers, desktop computers, and any other wireless device that shares the same IP address as the Smart TV.

27.     IP addresses are closely connected to the individuals using the specific IP address. For instance, hundreds of personal attributes can be connected to a

specific IP address, including a customers' age, profession, and certain wealth
indicators.

28.     The Vizio tracking software is also designed to scan a consumer's home
WiFi networks to secretly collect information that is then utilized to help determine
the specific person whose viewing activity has been collected.

29.     To accomplish this, Vizio provides the collected information to data
brokers, which are entities that offer data enhancement services.  These brokers are
able to match the information to information in its database. Linking the two data-
sets allows the data broker to inform Vizio, and thus, indirectly, Vizio's third-party
customers, of the identity of the individual watching the specific programming on
the Vizio Smart TV. That is, this software actually allows Vizio to determine, within
a certain degree of accuracy, which person in a home is watching what and when.

30.     Armed with this secretly-collected viewing information, Vizio then sells
the information to third parties, including advertisers. This information allows
advertisers and marketers to determine which advertisements to display on not
only a consumer's Vizio Smart TV, but also any other "smart" devices connected to
the same IP address, such as smartphones, tablets, and computers. Thus, watching
a specific program on the Vizio Smart TV allows advertisers to determine which
advertisements to publish on your smartphone.

31.     In other words, Vizio is secretly spying on its customers for profit. Vizio
does not deny that it is violating its customers' privacy in this manner. According to
an October 2015 Securities and Exchange Commission filing for an initial public

offering, Vizio described its ability to provide "highly specific viewing behavior data on a massive scale with great accuracy."   Then, in a Washington Post interview, a Vizio spokesperson explained that the company's data mining programs are part of a "revolutionary shift across all screens that brings measurability, relevancy and personalization to the consumer like never before."

32.     In fact, the October 2015 SEC filing reveals Vizio's intent to profit off of its secret data collection effort:

> The success of our Inscape data services will depend on many factors, including our ability to provide viewing behavior data that advertisers and media content providers find useful and valuable. This ability, in turn, depends to a significant extent on the willingness of consumers to continue to purchase and use our Smart TVs and in our maintaining and continuing to grow our community of VIZIO connected units, or VCUs. A VCU represents one of our Smart TVs that has been connected to the Internet and has transmitted data collected by our Inscape data services. While we believe our current community of over 8 million VCUs enables the data we provide to reflect U.S. census demographics, a larger and broader user base may be necessary for us to sufficiently monetize some services we may offer in the future, such as delivering targeted audiences to advertisers.
>
> Through our Inscape data services, we are capable of collecting meaningful viewing behavior data by matching attributes of content displayed on the screens of our ACR-capable, connected Smart TVs to a database of existing content, such as movies, TV shows and games. We currently rely on our third-party licensor of ACR technology to continue to develop and update this database, and to match the content in this database to content displayed on our VCUs.

33.     Ironically, despite its public assurances that there was nothing untoward about its surreptitious data collection, Vizio acknowledged in this same filing that consumers may be uncomfortable with the technology, which might negatively impact its growth strategy:

9

Furthermore, some individuals may be reluctant or unwilling to connect to the Internet through our Smart TVs because they have concerns regarding the risks associated with data privacy and security. If the wider public perceives data privacy or security concerns with respect to our Smart TVs, this could negatively impact the growth potential for the net sales of our Smart TVs and our Inscape data services.

34.   Although Vizio claims that its customers may choose whether or not to have their data collected, this is, in practicality, a false promise. Defendant Vizio does not obtain its consumers' consent to the monitoring during the initial Smart TV setup stage, nor does Vizio proactively notify its consumers that the company will be collecting the consumers' viewing data by utilizing the pre-installed tracking software. Rather, Vizio omits this material information in its communications with its consumers.

35.   In reality, Vizio conceals the tracking software and the method for disabling it. To "opt-out" of the monitoring, the consumer must somehow find the privacy policy, read and comprehend the complex legal text, and understand how and why Vizio is monitoring and collecting their personal information, including viewing habits. Vizio places its privacy policy on the television screen itself, but behind a series of electronic menus. Once accessed, the privacy policy appears on a very small area of the television screen, requiring the user to be very close to the television, while electronically scrolling through prolix text to find any alleged disclosure. Thus, for the vast majority of consumers who are unaware of the need to take steps to ensure their privacy, Vizio does nothing to alert them, preferring to keep its invasive monitoring and tracking practices a secret from its customers.

10

36.     Even were a consumer to understand the privacy policy and the so-called "option" to "opt-out" of the monitoring program, the consumer must then follow the numerous steps to deactivate the tracking software, none of which naturally appear to relate to disabling tracking software. Consumers would need to find a menu item called "RESET & ADMIN" on the television display. On this menu appear several items, one of which is entitled "Smart Interactivity." Once highlighted, the description of this menu item is "Enables program offers and suggestions." It does not state that "Smart Interactivity" monitors, tracks, and reports viewing habits and information about devices attached to home networks.

## FACTS RELATED TO PLAINTIFF

37.     In 2015, Plaintiff caused to be purchased a Vizio Smart TV from a Best Buy in Indiana.

38.     Plaintiff connected his Vizio Smart TV to the internet via his home wireless network. Plaintiff has, since the purchase of the Vizio Smart TV, watched shows, movies, and other entertainment programs, often through pre-loaded applications on the Smart TV.

39.     Plaintiff did not consent at the time of purchase and set-up, nor has he consented at any time since, to the operation of the Defendant's tracking software on his Smart TV. Additionally, Vizio did not notify Plaintiff of the pre-installed tracking software, either in printed materials contained in the Smart TV packaging or in the prompts guiding Plaintiff through the setup of the Smart TV.

11

40.    Had Plaintiff known that Defendant installed Tracking Software on his television set and was actively monitoring his viewing habits, he would not have purchased the Vizio Smart TV.

## COUNT I – VIOLATIONS OF THE VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710 ON BEHALF OF THE NATIONWIDE CLASS

41.    Plaintiff incorporates by reference those paragraphs set out above as if fully set forth herein.

42.    Defendant Vizio is a "video tape service provider" as defined by the Video Privacy Protection Act (hereinafter "VPPA"). Vizio "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale or deliver of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Specifically, Vizio delivers videos and "similar audio visual materials" to consumers through its internet-connected Smart TVs, as well as through many of the pre-loaded applications available on its Smart TVs.

43.    Plaintiff is considered a "consumer" under the VPPA because he is a "renter, purchaser or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1).  As described above, Plaintiff caused to be purchased a Smart TV manufactured, marketed, and distributed by Vizio.

44.    Plaintiff has watched many movies and television shows on the Vizio Smart TV. Upon information and belief, at all times Vizio secretly monitored Plaintiff's usage of his Smart TV, collected information on Plaintiff's viewing habits, and performed scans of Plaintiff's home WiFi.

45.     Unbeknownst to Plaintiff, Vizio has disclosed and continues to disclose Plaintiff's information, including his personally identifying information, to unidentified, unauthorized third parties. Upon information and belief, these third parties include advertisers.

46.     Vizio's transmissions of Plaintiff's personally identifiable information to these third party brokers and advertisers constitutes "knowing[] disclosures" of Plaintiff's "personally identifiable information" to a person under the VPAA. 18 U.S.C. § 2710(a)(1).

47.     Plaintiff did not, at any time, consent to Defendant Vizio's collection and disclosure of his personally identifiable information to these third party data brokers and advertisers.

48.     Vizio's unlawful disclosures constitute a direct violation of the VPAA. Thus, Plaintiff's statutory rights under the VPAA have been violated and he is therefore entitled to the maximum statutory and punitive damages available under the VPAA, 18 U.S.C. § 2710(c).

**COUNT II – VIOLATION OF THE PROHIBITION OF DISCLOSURE BY PERSONS PROVIDING VIDEO RECORDING SALES OR RENTALS WITHOUT WRITTEN CONSENT, CAL. CIV. CODE § 1799.3, ON BEHALF OF THE NATIONWIDE CLASS**

49.     Plaintiff incorporates by reference those paragraphs set out above as if fully set forth herein.

50.     In violation of California Civil Code, § 1799.3(a), Defendant, who provided video recording sales or rental services to Smart TV owners who connected

their televisions to the internet, disclosed such consumers' personal information or the contents of any record, including sales or rental information, which was prepared or maintained by Defendant, to third parties without the written consent of the Smart TV user, as fully described above.

51. Defendant willfully violated section 1799.3(a), as freely admitted in statements to the Securities and Exchange Commission, the media, and in its prospectus.

52. Plaintiff and Class Members may recover in this civil action, a civil penalty not to exceed $500 for each violation.

### COUNT III – VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"), CAL. CIV. CODE § 17200, *et seq.*, ON BEHALF OF THE NATIONWIDE CLASS

53. Plaintiff incorporates by reference those paragraphs set out above as if fully set forth herein.

54. The California Unfair Competition Law ("UCL") (California Business & Professions Code §17200, et seq.,) protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

55. The UCL prohibits any unlawful, unfair, or fraudulent business acts or practices, including the employment of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact.

## Unlawful or Unfair Business Act or Practice

56.     As described herein, Defendant's continued utilization of unlawful and unconscionable marketing practices, and their continuing practice of monitoring, tracking, and reporting viewing habits and personally identifiable information to unauthorized third parties, without consent, constitutes a deceptive act or practice in violation of the UCL.

57.     The disclosure of personal viewing history and personally-identifiable information is a material term of the transactions at issue as it is likely to affect a consumer's choice of, or conduct regarding, whether to purchase a product or service. The failure to inform consumers that this personal information would be shared with third parties is materially misleading.

58.     Defendant's omission of this information was an act likely to mislead Plaintiff and the Class acting reasonably under the circumstances and constitutes a deceptive trade practice in violation of the UCL.

59.     Defendant violated the "unfair" prong of the UCL by, among other misconduct described in this Complaint, transferring Plaintiff and the Class's personal viewing habits and personally identifiable information without providing clear and conspicuous notice and without consent.

60.     In violation of the Video Privacy Protection Act, 18 U.S.C. §§ 2710, and California Civil Code, § 1799.3(a), Defendant monitored, tracked, and transmitted personal viewing histories and personally identifiable information to third parties

without Plaintiff's and Class Members' consent. A violation of these statutes
constitutes a violation of the UCL.

### Fraudulent Business Act or Practice

61.    Defendant also made material omissions when speaking to Plaintiff
and Class Members through written materials. As described fully above, Defendant
failed to clearly and conspicuously inform consumers that once their Smart TVs
were hooked up to the internet through an IP address, Defendant would monitor,
track, and transmit personal viewing histories and personally-identifiable
information to third parties without Plaintiff's and Class Members' consent.

62.    Plaintiff satisfies the requisite level of specificity for pleading a
violation of section 17200's protection against fraudulent business acts as alleged
above. Particulars of the fraudulent omissions are summarized here:

a.    Defendant failed to clearly and conspicuously inform Plaintiff that once
his Smart TV was hooked up to the internet through an IP address,
Defendant would monitor, track, and transmit his and his family's
personal viewing histories and personally-identifiable information to
third parties without Plaintiff's consent.

b.    The material omissions occurred in 2015, as to the named Plaintiff.

c.    The relationship that gave rise to the duty to speak was by knowing
that the Smart TV would, once connected to the internet, obtain
confidential information, including viewing histories and personally
identifiable information, and transmit that information to others

16

without the knowledge or consent of the viewer. Defendant had superior knowledge as to the information withheld, and such information was material.

d. By engaging in the deceptive conduct, Defendant obtained substantial financial benefits by selling information about the Plaintiff, including personally identifiable information, to unauthorized third parties.

63. The injuries caused by the Defendant's conduct are not outweighed by any countervailing benefits to consumers or competition, and neither Plaintiff nor the Class could have reasonably avoided the injuries they sustained.

64. Defendant intended that Plaintiff and the Class would rely upon Defendant's deceptive conduct and not be aware of or understand the necessity to disable the Tracking Software.

65. The acts complained of herein, and each of them, constitute unfair, unlawful or fraudulent business acts or practices in violation of Business and Professions Code §17200 *et. seq*. Such acts and practices have not abated and will continue to occur unless enjoined.

66. The unfair, unlawful, or fraudulent business acts or practices set forth above have and continue to injure Plaintiff, the Class, and the general public and cause the loss of money. These violations have unjustly enriched Defendant at the expense of Plaintiff and the Class. As a result, Plaintiff, the Class, and the general public are entitled to restitution, injunctive relief, and other equitable relief.

67.     The unfair, unlawful, or fraudulent business acts or practices at issue in this Complaint and carried out by Defendant took place in the course of trade or commerce. Plaintiff and the Class lost money or property (or lost uses of their money and interest) as a proximate result of Defendant's conduct.

68.     By this action, Plaintiff and the Class request that Defendant be ordered to make restitution of any money, property, goods, or services that may have been acquired through its violation of Business & Professions Code § 17200 as alleged in this Complaint.

69.     Pursuant to Code of Civil Procedure § 1021.5 of the Code of Civil Procedure and the Court's inherent equitable power, Plaintiff and the Class seek recovery of their costs of suit and reasonable attorneys' fees.

## COUNT IV – INDIANA DECEPTIVE CONSUMER SALES ACT ON BEHALF OF THE INDIANA CLASS

70.     Plaintiff incorporates by reference those paragraphs set out above as if fully set forth herein.

71.     Vizio's actions as described above constitute a violation of the Indiana Deceptive Consumer Sales Act (hereinafter "DCSA"). Defendant is considered a "supplier" as it is defined in the DCSA, and the purchase of the Vizio Smart TV constituted a "consumer transaction" under the DCSA. Ind. Code § 24-5-0.5-2.

72.     As detailed above, Defendant engaged in incurable deceptive practices as defined under the DCSA. The Defendant's actions were part of a scheme intended to actively mislead Plaintiff and other Vizio Smart TV consumers into

18

believing that the Smart TVs were of a specific quality, namely that the Smart TVs would not violate their privacy and were not designed to violate consumer's privacy by secretly monitoring and recording consumers' viewing habits, while Defendant did in fact know that the Smart TVs were designed to accomplish precisely this objective.

73.     Additionally, Defendant did not disclose that their tracking software was installed on the Smart TVs because they knew that consumers, such as the Plaintiff, would not likely purchase the Smart TVs if they knew of the tracking software.

74.     Defendant's deceptive acts and practices were capable of deceiving a substantial portion of the purchasing public. In fact, the Defendant knew and intended that Plaintiff and other reasonable consumers could not be expected to learn about or discover the existence of the tracking software on the Vizio Smart TVs.

75.     Through these deliberate omissions, the Defendant deceived the Plaintiff about the quality of the Vizio Smart TVs and, as such, wrongfully induced the Plaintiff to purchase the Smart TVs.

76.     As a direct and proximate result of Defendant's violations of the DCSA, Plaintiff has suffered harm in the form of paying monies to purchase the Smart TV when he would not have otherwise.

19

77.     Plaintiff requests all appropriate remedies against Defendant for its willful violations of the DCSA, including monetary damages and an injunction requiring the Defendants to immediately cease the wrongful conduct alleged herein.

## COUNT VI – UNJUST ENRICHMENT
## ON BEHALF OF THE INDIANA CLASS

78.     Plaintiff incorporates by reference those paragraphs set out above as if fully set forth herein.

79.     A measurable benefit has been conferred on Defendant under such circumstances that Defendant's retention of the benefit without payment to Plaintiff and Class Members would be unjust.

80.     The benefit is the taking of Plaintiff's and Class Members' private information and capitalizing on it by selling it to third parties for Defendant's monetary gain.

81.     The benefit is measurable because Defendant's systematically, through carefully designed computer programs and calculations, commoditized and packaged Plaintiff's and Class Members' private information and sold it to third parties.

82.     Defendant retained both the private information and profits from its sale.

83.     Defendant's retention of the benefits would be unjust because this information was private and personal, it contained personally identifiable

20

information, and Plaintiff and Class Members would not have voluntarily provided that information for free, as Defendant has admitted, such as in its Prospectus.

## COUNT VII – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ON BEHALF OF INDIANA CLASS

84.    Plaintiff incorporates by reference those paragraphs set out above as if fully set forth herein.

85.    Plaintiff brings this claim for breach of Indiana's Uniform Commercial Code's implied warranty of merchantability on behalf of himself and other Members of the Indiana Class.

86.    Defendant is a merchant as defined by Indiana Code § 26-1-2-104.

87.    Though privity is not required, Plaintiff and Class Members were in privity with Defendant in that they purchased their TVs from retail agents of the Defendants, including the Defendant's authorized dealers. Defendant intended Plaintiff and Class Members, not the retail sellers they use to sell Smart TVs, to be the end users for whom the requirements of merchantability apply.

88.    Further, though privity is not required, Plaintiff and Class Members were and are also in privity with Defendant by virtue of the contractual relationship stemming from the Smart TVs' written warranties provided in conjunction with the purchase of their TVs, which are enforceable by Plaintiff and Class Members against Defendant, regardless of where, or from whom, Defendant's products were acquired. Further, or in the alternative, Plaintiff and Class Members were intended third-party beneficiaries of Defendant's contract for sale of Smart TVs to the

persons or entities from whom Plaintiff and Class Members ultimately purchased their Smart TVs.

89.     Defendant has breached the implied warranties of merchantability to Plaintiff and Class Members. The Defendant impliedly warranted to Plaintiff and Class Members that their Smart TVs would pass without objection in the trade, were of fair and average quality, were fit for the ordinary purposes for which such goods are used, were free of defects, and were merchantable. *See* Ind. Code § 26-1-2-314. The ordinary purpose of a television such as those at issue is viewing programs solely in the environment selected by the television owner. In addition, an ordinary use of devices, such as Smart TVs, that connect to the internet is the use of applications. Defendant impliedly represented to Plaintiff and Class Members that the Smart TVs at issue were free of defects that could impinge on these ordinary uses, that they were merchantable with respect to such uses, and that they were fit for all such purposes.

90.     As alleged herein, however, Defendant's sales of Smart TVs breached the implied warranty of merchantability because the devices were defective, unmerchantable, and not fit for the ordinary purpose for which such goods are used. More specifically, all Smart TVs that contained Tracking Software are defective and unfit for their ordinary purposes because, rather than performing as impliedly represented, these devices instead intercept, monitor, track, and transmit personal viewing histories and personally identifiable information to third parties without Plaintiff's and Class Members' consent.

91.    Defendant additionally breached the implied warranty of merchantability because Smart TVs, which all used Tracking Software, were defective, unmerchantable, and unfit for the ordinary purpose for which these goods are used because they intercepted and transmitted to third parties information contained on other devices sharing the same IP address as the Smart TVs, such as home computers, tablets, and cell phones. Defendant intended and caused this data to be used by third-party advertisers. Thus, Defendant's Smart TVs are defective because they cause private data contained on a person's other personal devices (cell phones, tablets, and personal computers) to be monitored and transmitted to third parties.

92.    The Defendant has had reasonable and adequate notice of Plaintiff's and Class Members'—i.e., consumers', rather than commercial parties'—claims for breach of implied warranty of merchantability, including by way of other lawsuits already filed against Defendant, by way of numerous reports of these breaches likely made to them directly, by way of media interviews and other publications that preceded the filing of plaintiffs' suits, and by way of their own statements reflecting exacting knowledge and actual intent to have their Smart TVs function in the manner alleged to be defective. Yet to-date, Defendant has demonstrated no willingness to make Plaintiff and Class Members whole.

93.    Any purported modifications or limitations of the implied warranty of merchantability, including by way of terms set forth in Defendant's written

warranties, are invalid, void, and unenforceable per the MMWA. 15 U.S.C. § 2308(a)(1).

94.     As a result of Defendant's breaches of its implied warranties of merchantability, Plaintiff and other owners of affected TVs have been injured and are entitled to the full panoply of remedies provided under Indiana Code 26-1-2, as well as all other applicable remedies. Because of the defects in the Smart TVs and their behavior as described herein, there was no value to the goods as accepted. The value of these devices had they been as warranted may be measured by their purchase prices; accordingly, damages in the sums of their purchase prices, or as otherwise measured pursuant to the damages provisions of Indiana Code § 26-1-2, are warranted to Plaintiff and Class Members.

95.     As a direct and proximate result of Defendant's breaches of the warranties of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial.

## COUNT VIII - VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2511

96.     Plaintiffs incorporate by reference those paragraphs set out above as if fully set forth herein.

97.     Defendant, either directly or by aiding, abetting, or conspiring to do so, has intentionally intercepted or procured to be intercepted Plaintiff's and Class Members' electronic communications without Plaintiff's or Class Members' knowledge, authorization, or consent in violation of 18 U.S.C. § 2511.

98.    Defendant, either directly or by aiding, abetting, or conspiring to do so, has also intentionally used or procured to be used a device to intercept the above-referenced electronic communications.

99.    Defendant conspired to intercept the content of the programs viewed by Plaintiff and Class Members on their Smart TVs, as alleged herein.

100.    Through the loading and enabling of ACR software on Smart TVs, and Cognitive's provision of the software, collection of communications, and provision of services to permit the illegal interception of electronic communications as alleged herein, Vizio set out on a course of conduct with the intention of intercepting communications of Plaintiff.

101.    An "electronic communication" is defined in § 2510(12) as any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate or foreign commerce. This definition includes television programming.

102.    Defendant violated 18 U.S.C. § 2511(1)(a) by intentionally intercepting, endeavoring to intercept, or procuring another person to intercept or endeavor to intercept Plaintiff's and Class Members' electronic communications.

103.    Defendant violated 18 U.S.C. § 2511(1)(c) by intentionally collecting, transmitting, storing and disclosing, or endeavoring to disclose, to any other person, the contents of Plaintiff's and Class Members' electronic communications, knowing or having reason to know that the information was

25

obtained through the interception of Plaintiff's and Class Members' electronic communications.

104.    Defendant violated 18 U.S.C. § 2511(1)(d) by intentionally using or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, knowing or having reason to know that the information was obtained through the interception of Plaintiff's and Class Members' electronic communications.

105.    Neither Plaintiff nor Class Members authorized or consented to Defendant's interception of electronic communications.

106.    Section 2520 of the ECPA provides for a private cause of action and allows for declaratory and equitable relief as appropriate, damages, disgorgement of profits, and statutory damages of the greater of $10,000 or $100 a day for each day of violation, actual and punitive damages, and reasonable attorney's fees and costs.

## RELIEF REQUESTED

Plaintiff, on behalf of himself and all others similarly situated, requests that the Court enter judgment against Vizio, as follows:

1.    An award to Plaintiff and the Class of damages;

2.    An award of attorneys' fees, costs, and expenses, as provided by law, or equity, or as otherwise available;

3.    An award of pre-judgment and post-judgment interest, as provided by law or equity; and

4.      Such other or further relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  February 17, 2016                   Respectfully submitted,

/s/ Lynn A. Toops

Irwin B. Levin, No. 8786-49
Richard E. Shevitz, No. 12007-49
Vess A. Miller, No. 26495-53
Lynn A. Toops, No. 26386-49A
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Fax: (317) 636-2593
ilevin@cohenandmalad.com
rshevitz@cohenandmalad.com
vmiller@cohenandmalad.com
ltoops@cohenandmalad.com

*Counsel for Plaintiff and the
Proposed Plaintiff Class*